[Civ. No. 44417. Second Dist., Div. Two. Feb. 4, 1976.]

ELEANOR A. BOTNEY et al., Plaintiffs and Appellants, v.
SPERRY & HUTCHINSON COMPANY,
Defendant, Cross-complainant and Appellant;
STATE BOARD OF EQUALIZATION,
Cross-defendant and Appellant.

**COUNSEL**

Botney, Robbins & Kay, Allen E. Botney and David Daar for Plaintiffs and Appellants.

Adams, Duque & Hazeltine, John H. Brinsley and James R. Willcox for Defendant, Cross-complainant and Appellant.

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, and Philip C. Griffin, Deputy Attorney General, for Cross-defendant and Appellant.

**OPINION**

**FLEMING, Acting P. J.**—The State of California imposes a sales tax on the purchase of merchandise by means of trading stamps, coupons, and the like. Beginning in 1961, Sperry and Hutchinson Company (S&H) collected sales tax reimbursements from stamp redeemers for merchandise obtained with its S&H Green Stamps on a valuation of $3 per book of 1,200 stamps, and it paid sales tax to the state on the basis of the same valuation. In 1971 Eleanor Botney and Thelma Daar, alleging that S&H overvalued the stamps in calculating the tax, brought a class action on behalf of an estimated 1.5 million California stamp redeemers against S&H for declaratory and injunctive relief and for damages for fraud and overcollection of sales tax reimbursements. S&H cross-complained against the State Board of Equalization for declaratory relief and indemnification in the event plaintiffs prevailed in the class action.

The trial court concluded: the action was a proper and manageable class action; plaintiffs failed to prove fraud and were barred by laches from claiming damages more than three years prior to the filing of their complaint; the collection of sales tax reimbursements by S&H was valid, lawful, and reasonable; the cross-action against the board therefore was

moot; but if the judgment were reversed and damages assessed against S&H, the latter would be entitled to indemnity from the board.

Plaintiffs have appealed the judgment, the dismissal of the fraud count, and "all orders, judgments and decrees entered by the Court following the trial of this action." S&H has appealed the judgment insofar as it found the class action proper and manageable. The board has appealed the judgment insofar as it determined that in the event of further proceedings the Board must indemnify S&H.

S&H, which operates throughout the United States, charges its California licensees the "normal, standard rate" of $3 per book of stamps. The licensees issue the stamps to their customers, who redeem books of stamps for merchandise or for $2 in cash. A book may contain stamps issued by different licensees, in different states, and over indeterminate periods of time. It is impractical to trace each stamp presented for redemption. Additionally, S&H offers advertising and promotional allowances to its licensees in the form of cash or stamps. For example, from 1970 to 1973 S&H offered California service station operators two free stamps for every three stamps purchased if they would display the S&H logo. Also, to induce wider distribution of stamps S&H offers California licensees a "2% agreement"; the licensee pays the regular rate for stamps on delivery, but if the licensee has $1 million in yearly gross stampable sales and distributes at least 10 million stamps at the rate of one stamp per $.10 of stampable sales, S&H will give it a cash rebate so that the total cost of its stamps will not exceed 2 percent of the licensee's total sales. Finally, S&H gives some stamps free of charge to charitable, religious, and public institutions.

The state imposes its sales tax on the privilege of selling tangible personal property at retail, and the tax is a percentage of the retailer's gross receipts. (Rev. & Tax. Code, § 6051.) "Gross receipts" means the total amount of sales valued in money, whether received in money or otherwise, but it does not include cash discounts allowed on sales. (Rev. & Tax. Code, § 6012.) Issuance of trading stamps by the retailer in conjunction with the sale amounts to a "cash discount" by the retailer. (*Sav-On Drugs, Inc.* v. *Superior Court,* 15 Cal.3d 1, 3-4 [123 Cal.Rptr. 283, 538 P.2d 739]; *Eisenberg's W. House* v. *St. Bd. Equal.,* 72 Cal.App.2d 8, 11 [164 P.2d 57].) The Board of Equalization's Regulation 1671, which governs sales taxation of trading stamp transactions, provides that the retailer may exclude the amount it pays for trading stamps from its

determination of gross receipts.[1] In turn, on the redemption of the stamps for merchandise by the trading stamp company, the sales price for purposes of sales taxation is "the average amount" paid by the retailers to the trading company for the stamps.

■ The trial court found: The board lawfully and reasonably applied Regulation 1671 to S&H's collection of sales tax reimbursements. S&H's gross receipts, excluding advertising expense stamps, approximated $3 per book of 1,200 stamps. Excluding cash rebates and stamps given without charge, the average amount paid by licensees to S&H was $3 per book. S&H collected sales tax reimbursements in good faith on the basis of $3 per book and remitted without profit all the tax collected to the board. S&H catalogs and stamps books stated that sales tax would be collected on redemption at a rate based on a valuation of $3 per book.

[1]Regulation 1671 provides in pertinent part:

"(a) Introduction. A variety of sales promotion plans involving premiums are in use by retailers. Common to these plans are some indicia furnished by the retailer to his customers based on the amount of purchases. Examples of such indicia are trading stamps, coupons, tickets and cash register tapes. Given quantities of indicia are surrendered by the customer in exchange for the premium.

"(b) Description of Plans. For the purposes of this ruling, these plans may be divided into three types, as follows:

"(1) At or near the time of making the sale the retailer incurs expense with relation to the premium by paying a third party, which third party assumes the obligation to furnish the premium to the retailer's customer. The retailer's payment to the third party is not dependent on his customers' subsequently surrendering the indicia in exchange for the premium.

". . . . . . . . . . . . . . .

"The typical trading stamp plan falls under (1) above. ·

". . . . . . . . . . . . . . .

"(c) Cash Discounts Generally. Cash discounts allowed and taken on taxable retail sales may be excluded from the measure of the tax. The promotion plans described above constitute cash discounts. The cash discount is allowed by the retailer and taken by the customer at the time the retailer incurs the expense with relation to the premium.

"(d) Plan Described in (b)(1).

"(1) Cash Discount. The retailer is entitled to a cash discount deduction at the time he pays the third party who undertakes to redeem the indicia used in the plan. The amount of the cash discount shall be computed on the basis of the amount the retailer pays to the third party for the indicia. See Paragraph (g) below for proration of cash discount where retailer's sales are not all taxable.

"(2) Sale of Premium. ·

"The delivery of premium merchandise in exchange for a prescribed number of units of indicia used in this type of plan constitutes a taxable retail sale of the premium merchandise by the person delivering the merchandise (assuming that the premium merchandise is of a kind the retail sale of which is subject to tax). The selling price is the average amount paid to the third party by its customers for the indicia surrendered in exchange for the premiums. In any event, however, the person delivering the premium merchandise shall pay tax in an amount no less than the amount of sales tax reimbursement collected from the consumer."

The board accepted S&H's valuation and received the taxes without dispute.

Plaintiffs do not challenge the validity of Regulation 1671. They contend, however, that in valuing a book of stamps at $3 S&H failed to follow the requirement of the regulation that the sales price of the merchandise be the "average price" paid by licensees for stamps. Plaintiffs argue the average price paid by licensees to S&H for stamps should be calculated by dividing S&H's gross receipts realized from licensees by the number of stamps redeemed for merchandise in the same period. Because of advertising stamps issued by S&H and cash rebates paid under the "2% agreements," on plaintiffs' calculation the average price would be significantly less than $3 per book.[2]

---

[2] The trial court found S&H did the following business in California from 1969 through 1972:

| | TOTAL STAMPS ISSUED TO LICENSEES (EXCLUDING ADVERTISING AND PROMOTIONAL STAMPS) | | TOTAL STAMPS ISSUED TO LICENSEES (INCLUDING ADVERTISING AND PROMOTIONAL STAMPS) |
|---|---|---|---|
| 1969 | 4,980,000,000 [?] | 1969 | 4,929,612,000 [?] |
| 1970 | 5,191,000,000 | 1970 | 5,606,908,000 |
| 1971 | 5,491,000,000 | 1971 | 6,210,704,000 |
| 1972 | 7,102,000,000 | 1972 | 7,639,920,000 |

| | GROSS MONEY PAID TO S&H FROM LICENSEES ON DELIVERY OF STAMPS | | MONEY PAID TO S&H BY LICENSEES (EXCLUDING 2% CONTRACT ADJUSTMENTS) |
|---|---|---|---|
| 1969 | $13,217,000 | 1969 | $10,937,923 |
| 1970 | 13,200,000 | 1970 | 11,048,961 |
| 1971 | 13,705,000 | 1971 | 11,799,719 |
| 1972 | 17,600,000 | 1972 | 14,403,645 |

| | TOTAL BOOKS OF S&H GREEN STAMPS REDEEMED |
|---|---|
| 1969 | 4,507,118 |
| 1970 | 4,145,875 |
| 1971 | 4,310,898 |
| 1972 | 4,632,000 |

Plaintiffs figure that in 1972, for example, net income ($14,403,645) divided by total stamps issued (7,102,000,000) and multiplied by the number of stamps in a book (1,200) gives an "average price" of $2.28 per book. The tax, then, would have been $.11 per book instead of $.15 and $.04 overpayment on 4,635,000 books would be an overcharge of $185,400.

According to these figures, plaintiffs Botney and Daar would have been overcharged $.60 and $.40, respectively, on their redemptions of S&H stamps in the applicable period of their suits.

The difficulty with plaintiffs' "average price" calculations is that income from stamps sold in any particular year bears no relationship to stamps redeemed in that year. Redeemed stamps may have been purchased by a licensee that same year or years before, in this or another state, at the standard price or in exchange for advertising, or they may have been received as a gift. Stamps sold to licensees during a given year may be redeemed the same year, the following year, or not at all.

We are persuaded that a reasonable and workable interpretation of the "average price" provisions of Regulation 1671 justifies the board's acceptance of the $3 per book valuation. The standard price S&H charges for its stamps is $3 per book. S&H gives rebates for free stamps only if it receives something in return, either promotional advertising or guaranteed distribution of stamps to large numbers of people. Thus the rebates and giveaways can be viewed as payment for services rendered, not reductions in the selling price of the stamps. The "average price" of the stamps remains a constant $3; the amount, if any, received by the licensee from S&H in cash or stamps depends on the amount of services rendered to S&H by the licensee. For S&H, payment for these services becomes a cost of doing business and hence a business expense for purposes of sales taxation. Business expenses may not be deducted from the sales price of goods sold (Rev. & Tax. Code, § 6011), and business expenses of a trading stamp company may not be deducted from the price of stamps sold to its licensees.

Plaintiffs, finding no authority in point, cite certain out-of-state rulings that require a retailer to include any rebate or post-purchase price adjustments by its supplier in the total of the retailer's gross receipts. (*In the Matter of Eagle Thrifty Drugs and Markets, Inc.,* Nevada Tax Commission, 29 March 1971; *Standard Oil* v. *State* (1937) 283 Mich. 85 [276 N.W. 908]; *Columbus Southern Lumber Co.* v. *Peck* (1953) 159 Ohio St. 564 [50 Ohio Ops. 457, 113 N.E.2d 1].) Plaintiffs reason that rebates and post-purchase adjustments should be deducted from the price paid for stamps by the retailer in order to avoid duplication. Reasoning based on out-of-state authority, however, carries little weight in the interpretation of idiosyncratic state sales tax statutes. Some states do not recognize trading stamps as a cash discount to gross receipts. (See *State Tax Commission* v. *Ryan-Evans Drug Stores* (1960) 89 Ariz. 18 [357 P.2d 607, 90 A.L.R.2d 332]; *Benner Tea Co.* v. *Iowa State Tax. Com.,* 252 Iowa 843 [109 N.W.2d 39]; *A. W. Cullum & Co.* v. *Calvert* (Tex.Civ.App. 1970) 450 S.W.2d 419.) Other states, unlike those cited in plaintiffs' list of authorities, do not recognize post-purchase price adjustments in calculat-

ing gross receipts. (*Frank J. Klein & Sons, Inc.* v. *Comptroller of Treasury* (1964) 233 Md. 490 [197 A.2d 243]; *Tyler Lumber Co.* v. *Logan* (1972) 293 Minn. 1 [195 N.W.2d 818].) From plaintiffs' point of view it matters little whether rebates or post-purchase price adjustments are included in the calculation of gross receipts at the time of issuance of the stamps, so long as the law is consistently applied. Since the state recognizes $3 as the average price paid for S&H trading stamps, we presume it allows S&H licensee-retailers to credit $3 as a cash discount on their sales to customers and thereby reduce the amount of the sales tax reimbursements collected from the retailer's customers. The retailer cannot then require sales tax reimbursements from its customers on that portion of the sales price on which it pays no sales tax. (See *Sav-On Drugs, Inc.* v. *Superior Court,* 15 Cal.3d 1, 4 [123 Cal.Rptr. 283, 538 P.2d 739].) Plaintiffs will pay the same total sales tax on the sum of the cost of the goods purchased and the cost of the trading stamp program, whether the total tax reimbursement is collected when the stamps are first issued or whether the portion of the tax attributable to stamps is collected at the time the stamps are redeemed.

In the light of our determination that the judgment is correct on its substantive merits, we find it unnecessary to consider the procedural issues of class action raised by the cross-appeals and the propriety of the contingent judgment entered against the board.

The appeals from orders and decrees other than the judgment are dismissed. The judgment is affirmed. Respondent S&H will recover its costs of appeal from appellants Botney and Daar. Other parties and respondent and appellants in their other capacities will bear their own costs of appeal.

Compton, J., and Beach, J., concurred.

A petition for a rehearing was denied March 2, 1976, and the petition of the cross-defendant and appellant for a hearing by the Supreme Court was denied March 31, 1976.